**Robert C. McFARLANE, Appellant,**

v.

**SHERIDAN SQUARE PRESS, INC., Appellee.**

No. 95–7201.

United States Court of Appeals, District of Columbia Circuit.

Argued April 18, 1996.

Decided Aug. 16, 1996.

Forrest A. Hainline, III, Washington, DC, argued the cause, and filed the briefs, for appellant.

Melvin L. Wulf, argued the cause, for appellee, with whom Daniel M. Kummer, New York City, was on the brief.

Before: WILLIAMS, GINSBURG, and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

In September 1992 Sheridan Square Press published Ari Ben–Menashe's *Profits of War,* a book concerning the involvement of the United States and of Israel in the international trade in arms. In the part here relevant, the book sets out Ben–Menashe's controversial allegations of an "October Surprise"—a Byzantine conspiracy involving candidate George Bush, high-ranking Republicans working on the 1980 Reagan–Bush campaign, and officials of the Government of Iran. The purpose of the alleged conspiracy was, on the Republican side, to delay until after the U.S. election the release of the American hostages held in Iran, thereby increasing the probability that Ronald Reagan would defeat then-President Jimmy Carter. In exchange, the Iranians would receive cash, promises of future arms sales, and the release of Iranian funds that had been frozen in U.S. banks. Included in Ben–Menashe's account of this elaborate conspiracy is the allegation that former National Security Adviser Robert C. McFarlane not only played an important role in the October Surprise negotiations but was an Israeli spy to boot.

Four months after the book was published, the entire October Surprise story was thoroughly discredited in the Joint Report of the Task Force to Investigate Certain Allegations Concerning the Holding of American Hostages by Iran in 1980, H.R. REP. No. 1102, 102d Cong., 2d Sess. (1993). When Sheridan Square failed to publish a retraction based upon the conclusions of the Task Force, McFarlane filed this defamation suit against both Ben–Menashe and Sheridan

Square. The district court granted summary judgment in favor of Sheridan Square on the ground that McFarlane could not show that the defendant published the book with actual malice. We affirm the decision of the district court.

## I. Background

Sheridan Square received the manuscript for *Profits of War* in January 1992. William H. Schaap, who is in effect the co-chief operating officer of Sheridan Square, assumed responsibility for the project. By his own account, Schaap "personally took part in every stage of the publication of *Profits of War* from its very inception, including the decision to publish the book, working with the author, seeing the book through the editorial process, and seeing the book through its publication and distribution."

McFarlane figures prominently in Ben–Menashe's account of the alleged October Surprise negotiations: he appears at four critical meetings with Iranian officials—in Tehran, Madrid, Washington, and Paris, all in 1980—that supposedly led to an agreement to delay the release of the hostages. *PW* at 53–55, 59–60, 71–72, 73–76. According to Ben–Menashe's account, McFarlane had a "special relationship" with Rafi Eitan, *id.* at 105, 169, an Israeli intelligence officer who had allegedly built a network of spies in the United States, *id.* at 313. McFarlane is described as "an Israeli mole," *id.* at 176, who provided Eitan with intelligence about U.S. activities in and negotiations with Iran, *id.* at 55, 69, 174–75. The book also identifies McFarlane as the senior U.S. official—the notorious "Mr. X"—who "had been providing computer access codes of intelligence reports" to Israeli intelligence, thereby facilitating Jonathan Pollard's espionage activities. *Id.* at 174. According to Ben–Menashe, McFarlane "came under FBI counterintelligence investigation in early 1991 regarding his relationship with Rafi Eitan and Israeli intelligence and his involvement in the Pollard case," but "the results of that investigation have never been made public." *Id.* at 345. Finally, the author suggests that McFarlane's suicide attempt during the 1987 congressional hear-

ings on the Iran–Contra affair was brought on by McFarlane's fear that "his role with the Israelis would surface." *Id.* at 194.

Schaap acknowledges being aware from the outset that Ben–Menashe was a controversial figure: "At every stage of the publication of the book ... I was alert to the question of the credibility of Ari Ben–Menashe ... because I had learned he was a controversial figure, and that there were different opinions about his credibility." When Schaap was reviewing the manuscript, there were in circulation a number of articles casting doubt upon Ben–Menashe's credibility. McFarlane contends that Schaap must have had at least a passing familiarity with the widespread skepticism about the author. *See, e.g.,* Tim Weiner, *Deathly Arsenal: How Israel Built the Bomb*, PHILADELPHIA INQUIRER, Nov. 10, 1991, at H1 (book review) (Ben–Menashe's "reputation among most reporters is, to put it politely, not of the highest order"); *Who Did It?*, PHOENIX GAZETTE, July 27, 1991, at A10 (Ben–Menashe referred to as "a proven fraud and imposter").

Although Ben–Menashe had been the subject of much criticism when Schaap was considering the manuscript of *Profits of War*, his claims had nonetheless attracted a great deal of attention, both from the media and from government investigators. Ben–Menashe had been the source for information explored in several television programs shown as part of PBS's *Frontline* series. In 1991 Gary Sick, a member of the National Security Council staff under President Carter, published a book entitled *October Surprise: America's Hostages in Iran and the Election of Ronald Reagan*, which set out at length the alleged Republican–Iranian conspiracy and relies to a large extent upon Ben–Menashe as a source of information. During that same year Pulitzer prize-winning journalist Seymour Hersh published *The Samson Option* which—again relying in large part upon Ben–Menashe—purports to describe Israel's nuclear capabilities and to implicate the late publisher Robert Maxwell as an Israeli spy. The allegations about McFarlane that appear in *Profits of War* were also repeated in a 1991 article written by Craig Unger for Esquire Magazine; that article,

too, relies extensively upon Ben–Menashe. *See McFarlane v. Esquire Magazine,* 74 F.3d 1296 (D.C.Cir.1996). In a later article, which Schaap says he read before the book was published, Unger claimed to have corroborated many of Ben–Menashe's October Surprise allegations; he also confirmed that Ben–Menashe worked for Israeli intelligence, quoting a high-ranking Israeli military intelligence officer as saying, "Ben–Menashe served directly under me. He worked for the Foreign Flow desk in External Relations. He had access to very, very, sensitive material." Craig Unger, *The Trouble with Ari,* VILLAGE VOICE, July 7, 1992, at 33, 35. Moreover, the Congress took an interest in Ben–Menashe's stories; the Senate Foreign Relations Committee held hearings on the October Surprise allegations, and the House of Representatives convened the aforementioned Task Force to investigate the charges. Ben–Menashe testified before both bodies under oath.

In an affidavit submitted to the district court in support of Sheridan Square's motion for summary judgment, Schaap swears that to ensure that the book was "factually accurate and safe from a libel point of view," he "went to great lengths to look into Mr. Ben–Menashe's reputation and to verify his manuscript as well as [he] could," devoting in excess of 100 hours to the task. Schaap's research included efforts to confirm some of the specific allegations in the book (those about McFarlane not among them) through books and articles on the subject and discussions with experts; reading articles by reputable journalists who had relied upon and to some degree verified Ben–Menashe's knowledgeability; and discussing Ben–Menashe and his credibility with a number of these journalists. Schaap's research was limited for the most part to secondary sources, though he did telephone a former Iranian Defense Minister and confirm that he knew Ben–Menashe—who claimed the man was one of his contacts for arms sales and the exchange of intelligence. Following Ben–Menashe's acquittal in a criminal prosecution for illegal arms dealing, Schaap obtained the trial transcript, a series of documents confirming Ben–Menashe's association with Israeli military intelligence, and copies of Ben–

Menashe's civilian passports for 1985 to 1989, which showed that Ben–Menashe had traveled frequently to many of the locations involved in the October Surprise allegations. (Schaap did not, however, have access to Ben–Menashe's passport for 1980, which might have cast doubt upon his claim to have been in Paris during the alleged 1980 meeting there.) Schaap also served as Ben–Menashe's attorney at the closed hearings of the House Task Force and of the Senate Foreign Relations Committee in June and August 1992. In that capacity, Schaap contends, he was able to observe Ben–Menashe's demeanor and to hear Ben–Menashe repeat, under oath, the allegations about McFarlane that were in the manuscript of his book.

Based upon his observations and his research, Schaap concluded that Ben–Menashe's story was credible, and he proceeded to publish even those allegations that he could not verify. He declares, "I did verify so many of the controversial passages and so many of Ben–Menashe's factual assertions, and was so assured by the large number of journalists I had consulted that they had found Ben–Menashe's information credible, I felt confident about leaving in the book material that could not be further verified because of my belief, based on all of my inquiries and checking, that Ben–Menashe was overall entirely reliable." Schaap did not, however, attempt to discuss the allegations with McFarlane himself, nor did he inquire about Ben–Menashe's sources for the allegations about McFarlane or contact Rafi Eitan or others who might have had first-hand knowledge of the truth or falsity of Ben–Menashe's specific allegations.

As he readied *Profits of War* for publication, Schaap received two memoranda prepared by attorneys who had reviewed the manuscript for potential libel problems; McFarlane contends that these memoranda put Schaap on notice that there were "problems with the accuracy" of the book. The first of these memoranda, prepared by Sheridan Square's counsel Melvin Wulf, identified passages with respect to which he considered "the risks of legal action ... high." The second memorandum was prepared by David Hooper of Biddle & Co., a firm of English

solicitors; Hooper emphasized Ben–Menashe's "credibility problem" and suggested that there were some "inaccuracies" (most of them minor) that should be corrected in consultation with an expert. Hooper noted specifically that "[t]he evidence relating to the Ritz [in Paris] and other meetings needs to be carefully evaluated, particularly as [Ben–Menashe] was not there." Finally, he identified the passages in the book, including those pertaining to McFarlane, that he considered "potential libel problems," and advised that "where there is no realistic prospect of obtaining corroborative evidence" of the most serious allegations, they "must be removed."

After the book was printed but before it was distributed, Sheridan Square learned of one unarguable error in the text: the leader of a Peruvian revolutionary group said in the book to be dead had turned up alive in a Peruvian prison. Sheridan Square corrected this error by inserting an erratum slip in every copy of the book. No such correction was inserted, however, when the Task Force issued its findings four months after the book was published.

McFarlane filed this suit against Ben–Menashe, the National Book Network (which distributed the book), and Sheridan Square in June 1993. The district court granted the distributor's motion for summary judgment on the ground that no one at the company had ever read the book, and McFarlane has not appealed that ruling. The district court denied Sheridan Square's motion for summary judgment, on the ground that the following evidence would support a finding that Schaap had serious doubts about McFarlane's veracity: (1) Schaap knew that McFarlane disputed the allegations; (2) the two lawyers' memoranda put Schaap on notice of the potential for a libel action based upon the allegations concerning McFarlane; (3) Schaap knew that Ben–Menashe was a person of questionable credibility; and (4) Schaap never sought direct confirmation of the allegations about McFarlane from people who may have had first-hand knowledge. Moreover, the court concluded that because Schaap had acted as Ben–Menashe's attorney during the Task Force hearings, Schaap must have had access to information—specifically, to Ben–Menashe's passport for the period of the alleged October Surprise meetings—that would have enabled him to reach the same conclusion that the Task Force ultimately reached, namely, that there was no credible evidence to support the October Surprise allegations. According to the court, these factors, taken together, "would permit a jury to find that [Schaap] purposefully avoided the truth."

Upon Sheridan Square's motion for reconsideration, the district court reversed itself and granted summary judgment for the publisher. "Although Schaap's original summary judgment affidavit implied that he had access to *all* of Ben–Menashe's passports," the court found, in fact he only had access to Ben–Menashe's civilian passports covering the period from 1985 to 1989; therefore, "Schaap could not have discovered that Ben–Menashe's passports did not reflect any travels to Paris in October, 1980, as the Task Force had found after a more complete review." Because Schaap did not have access to the other evidence presented to the Task Force, the court held, there is no basis upon which a jury could conclude that Schaap blinded himself to the truth that the Task Force was able to discover. Nor is there evidence that Ben–Menashe's congressional testimony—the only testimony that Schaap heard—was internally inconsistent, so despite the Task Force's ultimate conclusion that Ben–Menashe's story was not credible, Schaap could not have known, based solely upon Ben–Menashe's testimony, that he was lying. Because a publisher has no duty to investigate unless he has "obvious reasons" to doubt the veracity of his source, Schaap had no duty to seek out those who may have had first-hand knowledge of the October Surprise in order to confirm the allegations about McFarlane. Even if Schaap did have a duty to investigate, the court found that he did not have in his possession the documents he would have needed in order to prove that Ben–Menashe did not travel to Paris in 1980. Therefore, the evidence could not support a finding of actual malice on the part of the publisher.

McFarlane appeals the grant of summary judgment for Sheridan Square. Meanwhile,

his case against Ben–Menashe is pending before the district court.

## II. Analysis

■■■ In a libel action brought by a public figure, summary judgment for the defendant is appropriate unless the plaintiff produces the clear and convincing evidence that a reasonable jury would need in order to find that the defendant published the defamatory material with actual malice. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2514–15, 91 L.Ed.2d 202 (1986); *Clyburn v. News World Comm., Inc.*, 903 F.2d 29, 33 (D.C.Cir.1990). A publisher acts with "actual malice" if it either knows that what it is about to publish is false or it publishes the information with "reckless disregard" for its truth or falsity. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964) (establishing "actual malice" standard for defamation of public officials); *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 163–64, 99 S.Ct. 2701, 2705–06, 61 L.Ed.2d 450 (1979) (actual malice standard extends to defamation of "public figures"). Accordingly, in order to survive Sheridan Square's motion for summary judgment McFarlane must show, as the Supreme court has since glossed *Times v. Sullivan*, that the defendant "entertained serious doubts as to the truth of [its] publication" or acted "with a high degree of awareness of . . . [its] probable falsity." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325–26, 20 L.Ed.2d 262 (1968).

■■■ The actual malice standard is subjective; the plaintiff must prove that the defendant actually entertained a serious doubt. *Tavoulareas v. Piro*, 817 F.2d 762, 776 (D.C.Cir.1987) (en banc) (defendant must have "come close to wilfully blinding itself to the falsity of its utterance"). Although this fact may be proved by circumstantial rather than direct evidence, "the plaintiff must establish that even in relying upon an otherwise questionable source the defendant actually possessed subjective doubt." *Secord v. Cockburn*, 747 F.Supp. 779, 794 (D.D.C.1990) (plaintiff cannot survive summary judgment merely by showing that some of defendant's sources were convicted felons); *see St. Amant*, 390 U.S. at 730, 88 S.Ct. at 1325 (when defendant had implicated sheriff and union leader in alleged wrongdoing, actual malice could not be inferred from defendant's having relied solely upon affidavit of union dissident of unknown veracity and having failed to verify allegations with sources who might have known). Moreover, because the actual malice inquiry is subjective—that is, concerned with the defendant's state of mind when he acted—the inference of actual malice must necessarily be drawn solely upon the basis of the information that was available to and considered by the defendant prior to publication. *See Bose Corp. v. Consumers Union*, 466 U.S. 485, 498, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984).

McFarlane concedes that he is a public figure, so the only question before us is whether a jury could reasonably conclude that the evidence clearly and convincingly shows Sheridan Square acted with actual malice. On appeal, McFarlane advances four bases upon which he says a jury could reach that conclusion. First, McFarlane argues that Schaap's knowledge of Ben–Menashe's dubious credibility created in him a duty to corroborate the allegations against McFarlane; Sheridan Square's decision to publish without having corroborated those allegations betrays a reckless disregard for the truth. Second, McFarlane contends that by deciding to go ahead with the publication after having attempted but failed to corroborate the allegations, Schaap acted in reckless disregard of the truth. Third, McFarlane argues that there is a genuine issue of fact concerning Schaap's credibility; Schaap's assertion that he had no serious doubt about the veracity of the McFarlane allegations depends upon his own credibility, and a jury could infer, based upon inconsistencies and errors in the affidavit he submitted, that he lied about what he knew and when he knew it. Finally, McFarlane contends that Sheridan Square's failure to retract or correct the alleged falsehoods when it had reason to do so is another instance of its actual malice.

### A. Duty to Corroborate

■■■ Sheridan Square concedes that it published *Profits of War* without having any

independent verification of the allegations about McFarlane; in other words, Schaap did not uncover any affirmative evidence that McFarlane was indeed an Israeli spy or that he played a role in the alleged arms-for-hostages scheme. According to McFarlane, this complete want of corroboration, when viewed in combination with the known controversy surrounding Ben–Menashe, is sufficient to support a jury's conclusion that Sheridan Square published the book with actual malice. In essence, McFarlane urges us to impose upon a publisher a "duty to corroborate" at least when the source of potentially libelous material is a person of questionable credibility. That we cannot do, for the following reason.

The rule McFarlane proposes would work a dramatic change in the nature of the actual malice standard as the Supreme Court established it in *Times v. Sullivan. See* 376 U.S. at 279–80, 84 S.Ct. at 725–26. The term "actual malice," as we have said, describes a state of mind; in order to prevail, the plaintiff must provide clear and convincing evidence that would "permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325–26; *see also Tavoulareas,* 817 F.2d at 789 ("the 'serious doubt' standard requires a showing of subjective doubts by the defendant. It does not turn on whether a reasonably prudent person would have published under the circumstances"). Accordingly, a publisher's effort to investigate damaging allegations, particularly when they are made by a questionable source, is evidence that the publisher neither believed the allegations to be false nor wilfully blinded himself to the truth. To hold that a publisher who relies upon a questionable source must not only investigate the allegations but actually corroborate them—that is, establish through an independent source that the allegations are true—would be to turn the inquiry away from the publisher's state of mind and to inquire instead whether the publisher satisfied an objective standard of care. *See Washington Post Co. v. Keogh,* 365 F.2d 965, 972–73 (D.C.Cir.1966) (discussing difficulties with proposed rule requiring newspapers to verify controversial allegations).

Indeed, the cases McFarlane cites in support of this supposed "duty to corroborate" only confirm the subjective nature of the inquiry. In *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the Saturday Evening Post had published an article accusing a college athletic director of "fixing" a football game. The publisher was aware that the source for this story, a local insurance salesman who claimed to have overheard a conversation between the plaintiff and the coach of the opposing team, was on probation for having passed bad checks. *Id.* at 136, 157, 87 S.Ct. at 1981–82, 1992–93. Despite the obvious reason to question the veracity of the source, the magazine did not take even the most "elementary precautions," *id.* at 157, 87 S.Ct. at 1992–93; the writer assigned to the story attempted neither to examine the notes the source claimed to have taken during the conversation he overheard nor to view the tapes of the football game in order to find out whether the opposing team had used the plays that the plaintiff had allegedly passed to its coach, *id.* at 157–58, 87 S.Ct. at 1992–93. The Supreme Court held that this evidence "amply supported" the jury's verdict for the plaintiff. *Id.* at 161, 87 S.Ct. at 1994–95. Neither the plurality opinion by Justice Harlan nor Chief Justice Warren's opinion concurring in the result suggests that the Post had any obligation to prove the story true before publishing it; rather, the publisher was held liable because its failure to take even the simplest and most obvious steps to investigate the allegations demonstrated a reckless disregard for the truth. *See id.* at 156–58, 87 S.Ct. at 1992–93 (Harlan, J.); *id.* at 169–70, 87 S.Ct. at 1998–99 (Warren, C.J., concurring).

In *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989), the defendant newspaper, relying upon a single source, had accused a candidate for public office of using "dirty tricks" to influence a grand jury investigation so as to cast doubt upon his opponent. Although the newspaper did interview all but one witness to the events at issue—each of whom contradicted the source's account—the editors failed to interview the

only witness who had no particular loyalty to the plaintiff; this witness was the person most likely to confirm the source, but had she not done so her denial of the story would have demonstrated convincingly that it was false. *Id.* at 682, 109 S.Ct. at 2693. The newspaper also failed to review two audiotapes that could easily have verified or disproved the allegations. *Id.* at 683, 109 S.Ct. at 2693–94. The Supreme Court held that the evidence supported the jury's finding of actual malice; it was "likely that the newspaper's inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [the] charges. Although failure to investigate will not alone support a finding of actual malice ... the purposeful avoidance of the truth is in a different category." *Id.* at 692, 109 S.Ct. at 2698. Again, the Court's conclusion turned not upon the newspaper's failure to prove the story true but upon its deliberate decision to avoid information that might have proven the story false.

When the source of potentially libelous material is questionable, therefore, the investigatory efforts of the publisher are important only to the extent that they serve as evidence that it did not publish the material in reckless disregard of the truth. As in *Butts* and *Connaughton,* if a defendant has reason to doubt the veracity of its source, then its utter failure to examine evidence within easy reach or to make obvious contacts in an effort to confirm a story would be evidence of its reckless disregard. That a publisher can by investigating a questionable allegation preclude the implication that it acted in reckless disregard of the truth does not mean, however, that the publisher has a duty to corroborate the allegation.

*B. Reckless Disregard for the Truth*

Even without a "duty to corroborate," the question remains whether McFarlane has produced evidence sufficient to support a jury's conclusion that Sheridan Square entertained "serious doubt" about the truth of the allegations concerning McFarlane. *Tavoulareas,* 817 F.2d at 788–89. McFarlane contends that a reasonable jury could find that Sheridan Square acted with actual

malice based upon (1) Schaap's decision to publish the book without first verifying Ben–Menashe's story with any of the major figures in it; (2) his inability to corroborate the allegations about McFarlane; (3) the warnings of American and English counsel; (4) the alleged inconsistency between Ben–Menashe's passports and his account of where he was at particular times; and (5) his awareness of Ben–Menashe's credibility problems. We take up each of these points in turn, but recognize that McFarlane is "entitled to an aggregate consideration of all [his] evidence," construed most favorably to him, when we determine whether he has met his burden. *Tavoulareas,* 817 F.2d at 794 n. 43; *see McFarlane v. Esquire Magazine,* 74 F.3d at 1304.

McFarlane first argues that Schaap's failure to contact any individual who would have had first-hand knowledge of McFarlane's alleged involvement in an October Surprise demonstrates that Sheridan Square "wilfully blind[ed] itself to the falsity of its utterance," *Tavoulareas,* 817 F.2d at 776; if Schaap had contacted these sources, McFarlane suggests, he would have reached the same conclusion as did the Task Force. Although it is true that Schaap relied for the most part upon secondary sources, there is no authority for the proposition that anything short of interviewing those with first-hand knowledge amounts to "willful blindness." On the contrary, we have held that a publisher's "good faith reliance on previously published reports in reputable sources ... precludes a finding of actual malice as a matter of law." *Liberty Lobby, Inc. v. Dow Jones & Co.,* 838 F.2d 1287, 1297 (D.C.Cir. 1988). Nor is it clear, as it was in *Connaughton,* that the individuals whom the defendant failed to contact would have provided any credible information. *Cf. Connaughton,* 491 U.S. at 682, 109 S.Ct. at 2693. Schaap's failure to contact McFarlane himself about the allegations provides even less support for a finding of actual malice. Schaap knew from Ben–Menashe's manuscript that McFarlane had sued Craig Unger for defamation based upon similar allegations, *PW* at 345; Schaap could reasonably expect McFarlane to deny any involvement regardless of

the facts. *See Edwards v. National Audubon Soc'y, Inc.,* 556 F.2d 113, 121 (2d Cir. 1977) ("[S]uch denials are so commonplace in the world of polemical charge and counter-charge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error").

 Apart from his claim about Schaap's methods, McFarlane contends that Schaap's decision to publish despite his inability to confirm the allegations about McFarlane is itself evidence of actual malice. The cases McFarlane cites in support of this argument, however, show that actual malice may be inferred from an author's or publisher's inability to corroborate a story only when, in attempting to corroborate, he encounters persuasive evidence that contradicts the allegation. For example, in *Brown & Williamson Tobacco Corp. v. Jacobson,* 827 F.2d 1119 (7th Cir.1987), the defendants reported without corroboration the accusation that a cigarette company had adopted a "pot, wine, beer, and sex" advertising strategy; before this claim was published, however, the defendants discovered that the company had never actually adopted the strategy. Moreover, prior to trial, the defendants destroyed all their interview and research notes; the court found that to be "the most compelling evidence of actual malice." *Id.* at 1134. Similarly, in *Schiavone Construction Co. v. Time, Inc.,* 847 F.2d 1069 (3d Cir.1988), after attempting without success to corroborate the story, the defendant published a claim that the name Schiavone had appeared several times in an FBI file concerning the disappearance of Jimmy Hoffa. The evidence showed, however, that four reliable sources had each told the defendant that the name did not appear in the FBI file. *Id.* at 1091. In this case, by contrast, although Schaap was unable to get independent verification of the charges against McFarlane, he encountered no contradictory evidence (aside from McFarlane's denial and the general skepticism about Ben Menashe discussed below). As a result, the publisher's lack of corroboration in this case provides little if any support for a finding of actual malice.

 Nor are we persuaded by the appellant's novel contention that "if a publisher undertakes an attempt to corroborate an informant's defamatory claims and fails to find any corroborating evidence, a jury may find actual malice if the statements are published anyway." According to McFarlane, this proposition follows by analogy from the rule that even though a passerby has no duty to rescue or assist a person in danger, one who undertakes to help must act with due care. The appellant offers us no authority for imposing a duty of care upon a publisher who undertakes to investigate controversial allegations before putting them into circulation, nor do we see how doing so could be reconciled with the actual malice standard that the Supreme Court has prescribed for a public figure who has been libeled.

 McFarlane also argues that Schaap had in hand two pieces of information that should and indeed must have alerted him to the falsity of the allegations: Ben–Menashe's passports for 1985 to 1989, which are not in all respects consistent with his account of where he was during that period; and the specific warning from a firm of English solicitors that Ben–Menashe was not at the Paris meeting in 1980 at which he claims to have seen George Bush and William Casey. According to McFarlane, this evidence refutes Schaap's statement in his affidavit that despite "at least a hundred hours" of fact-checking and performing research on the allegations in *Profits of War,* he was not able to establish that any allegation in the manuscript is false. Neither of these items, however, provides much support for a finding of actual malice.

First, at oral argument McFarlane's counsel directed our attention to a chronology drawn from Ben–Menashe's passports for 1985 to 1989; at least one of the allegations in the book, he argued, is flatly inconsistent with the dates and places listed in this chronology. Assuming, *arguendo,* that the dates on the passport for that particular period are not merely ambiguous but actually inconsistent with Ben–Menashe's story, it is not an inconsistency upon which a reasonable jury could base a finding of actual malice. In his affidavit, Schaap described his examination of these passports as follows:

The examples described above about the results of my fact-checking are just some of the several dozens of specific matters I tracked down in detail. There were many dozens of names and dates and places that I checked through database searches and, in the case of dates, also through a careful review of Mr. Ben–Menashe's passports. Virtually all of the people named were who Mr. Ben–Menashe said they were, and the events he described had happened at the times and places he said they had.

This statement is insufficient as a basis for charging Schaap with knowledge of all the dates listed in the passports; his claim to have checked "many dozens" of dates "through a careful review of Mr. Ben–Menashe's passports" makes clear that he did not check more than a small portion of the many dates and places mentioned in the book. With no reason to believe that Schaap had checked the particular date upon which McFarlane's counsel pounced, the inconsistency between the book and the passport is very weak evidence indeed.

 Second, McFarlane contends that the memoranda from Wulf and Hooper to Sheridan Square must have alerted Schaap to "problems with the accuracy" of *Profits of War*. McFarlane's argument, however, mischaracterizes the nature of the memoranda. Although Hooper commented generally upon Ben–Menashe's credibility problems and both lawyers listed specific passages for which they believed "the risks of legal action are high," neither purported to comment upon whether there was reason to doubt the truth of the passages or upon whether a legal action was likely to be successful. The subject passages were singled out, it appears to us, because they made controversial and damaging allegations. Moreover, Hooper's warning that the allegations must be corroborated is of no consequence here; in the United States the defendant in a libel action does not bear the burden, as he would in England, of proving with admissible evidence that his damaging factual allegations are true.

The Hooper memorandum does, however, present what at·first glance appears to be the strongest evidence against Sheridan Square: Ben–Menashe did not personally attend the 1980 Paris meeting but rather received his information second-hand, which, according to McFarlane, contradicts Ben–Menashe's claim in the book. McFarlane makes much of this—"Schaap disregarded this important example of Ben–Menashe's dishonesty and of the truth"—but there is less than meets the eye in this claimed inconsistency between the book and Hooper's statement. In *Profits of War* Ben–Menashe never actually claims that he attended the alleged meeting at the Ritz with President Bush and William Casey; instead, he clearly describes himself as essentially an advance-man for the meeting, able to witness who attended but not to observe the meeting itself. *PW* at 73–76. Ben–Menashe admits that he learned of the details of the alleged deal several days later from an Israeli named Yehoshua Sagi. *Id.* at 75. The Hooper memorandum, which was based upon both the manuscript and conversations with Ben–Menashe, is entirely consistent with Ben–Menashe's account in the book. Hooper wrote:

> The evidence relating to the Ritz and other meetings needs to be carefully evaluated, particularly as ABM was not there. [Sayeed Mehdi] Kashani reported back to Sagi as did [Rafi Eitan] and that is the source of ABM's knowledge. Kashani spoke directly to ABM as well.

Although the Task Force later concluded that Ben–Menashe could not have been in Paris at all in October 1980 because his civilian passport shows that he was in Israel at that time and there was no evidence that he held a diplomatic passport, from Schaap's perspective before the book was published, there was no extrinsic reason to suspect that Ben–Menashe's account of the Paris meeting was false.

 At this point it becomes clear that McFarlane's ability to prove actual malice rests almost entirely upon circumstantial evidence. The Supreme Court in *St. Amant* identified three types of circumstantial evidence that would likely support a finding of actual malice: They are evidence establishing that the story was (1) "fabricated," (2) "so inherently improbable that only a reckless man would have put [it] in circulation," or (3)

"based wholly on" a source that the defendant had "obvious reasons to doubt," such as "an unverified anonymous telephone call." 390 U.S. at 732, 88 S.Ct. at 1326. The first of these is not relevant here; although the Task Force ultimately found that there is "no credible evidence" to support Ben–Menashe's allegations of an October Surprise, *see* Task Force Report at 175, McFarlane points to no evidence that would have been available to Schaap before he published *Profits of War* establishing that the story is a fabrication. Second, we cannot conclude that the inherent improbability of the allegation itself supports a finding of actual malice; when Sheridan Square published Ben–Menashe's book the Senate Foreign Relations Committee was taking his allegation of an October Surprise seriously enough to hold hearings on the matter, and the House of Representatives had commissioned the Task Force specifically to investigate this story. Accordingly, we are concerned here solely with the third possibility, *viz.*, that the author of the allegation was someone whom Schaap had "obvious reasons to doubt."

Schaap concedes that he was aware that Ben–Menashe "was a controversial figure" and that "there were different opinions about his credibility." We need not dwell, therefore, upon whether Schaap knew about specific press accounts of Ben–Menashe's dubious character; suffice it to say that Schaap was on notice that Ben–Menashe was controversial and had often been discredited. Indeed, the author himself notes this criticism in the book, though not in an unbiased tone. *PW* at 348–50; *see McFarlane v. Esquire Magazine,* 74 F.3d at 1304 ("full (or pretty full) publication of the grounds for doubting a source tends to rebut a claim of malice, not to establish one"). Even journalists who had relied upon Ben–Menashe expressed their general distrust of him: Craig Unger, for example, was quite forthright in criticizing Ben–Menashe in an article that Schaap concedes he read. *See The Trouble with Ari, supra,* at 39 ("Ben–Menashe may be suffering from an advanced form of Defector's Syndrome. Having spun tales for two years, many of which were true, he is now all used up, but, afraid of losing his audience, he

brays like a dying elephant, making up whatever he thinks they want to hear").

Schaap had reason to be wary of Ben–Menashe, but he also had some reason to believe the story, based upon his own research and his conversations with journalists and experts on Middle East affairs. Unger himself is quick to explain that Ben–Menashe's propensity to exaggerate and even to lie about his relative importance in any given situation should not lead a reader to discount his established knowledgeability in these matters. *Id.* ("Just as it is indisputable that Ben–Menashe lies, so is it indisputable that in some sense he is who he says he is, that the most closely guarded secrets in the world have passed before his eyes"). Ben–Menashe's friend Rebecca Sims, who brought Sheridan Square the manuscript for *Profits of War,* apparently shares this view: Unger quotes her as saying, "Ari is a pathological liar.... But the thing is, there is so much evidence to support many of his allegations." *Id.* Moreover, both Unger and Gary Sick, the former NSC staffer, claimed to have verified some of Ben–Menashe's allegations; Sick—who, along with other experts, reviewed the *Profits of War* manuscript—told Schaap that he found Ben–Menashe's story about the October Surprise to be credible. Accordingly, although the press accounts must have given Schaap reason to be skeptical about Ben–Menashe, his conversations with these journalists also gave him reason to believe that the allegations were not fabricated.

Even more damaging to McFarlane's case for actual malice are the facts surrounding Schaap's participation alongside Ben–Menashe in the congressional investigation of the October Surprise story. As we noted in *McFarlane v. Esquire Magazine,* "we have in the past given weight to the fact that a source told congressional investigators the same story that he told the defendant, under circumstances where lying could have serious consequences." 74 F.3d at 1305; *see Tavoulareas,* 817 F.2d at 791 (defendant's most important reason to believe otherwise questionable source was defendant's "uncontroverted knowledge that [the source] provided virtually the same information to [the author]

as he gave to investigators for the House Subcommittee"). In the *Esquire* case the publisher claimed that its knowledge that Ben–Menashe had been "interviewed by congressional staffers" gave it reason to believe the allegations; we rejected this argument because Esquire "d[id] not even claim to have had information that Ben–Menashe's statements to the investigators were the same as to Unger, and it offered no evidence that the circumstances of the interviews in any way would have alerted Ben–Menashe to the penalties for lying." 74 F.3d at 1305. In the present case, however, the publisher was present—indeed in his capacity as Ben–Menashe's lawyer—during the author's testimony before both the Senate Foreign Relations Committee and the House Task Force; Schaap's affidavit states that he heard Ben–Menashe repeat under oath "exactly what he had said in his manuscript," including the allegations about McFarlane. Schaap "was impressed with his demeanor and believed that he was telling the truth." Also, the testimony Schaap heard was given in a far more formal setting than were Ben–Menashe's earlier "interviews with congressional staffers"; the penalties for lying would have been quite clear.

In sum, there is persuasive evidence that Schaap had reason to believe Ben–Menashe's allegations, and the cumulative force of the evidence to the contrary is very weak. Therefore, we must conclude that a reasonable jury could not have found by clear and convincing evidence that Sheridan Square published *Profits of War* with actual malice.

## C. Schaap's Lack of Candor

■ McFarlane contends that a jury could find Schaap perjured himself in his original affidavit in support of Sheridan Square's motion for summary judgment. Such a lack of candor on Schaap's part, argues McFarlane, would support a finding of actual malice; moreover, to the extent that this lack of candor raises a question about Schaap's own credibility, McFarlane argues, that question is properly an issue for the jury. McFarlane points to several statements in Schaap's affidavit that he contends

evince a lack of candor; only two of these merit discussion.

The first instance of Schaap's alleged lack of candor occurs in his claim, set out above, to have used Ben–Menashe's passports for fact-checking the allegations in *Profits of War*. According to McFarlane, Schaap's statement that he confirmed, "through a careful review of Mr. Ben–Menashe's passports ... [that] the events he described had happened at the times and places he said they had" must be a falsehood because the only passports Schaap had in his possession were those for 1985 to 1989, long after the alleged events implicating McFarlane. In context, however, Schaap's statement does not imply that he checked all the dates in the book—or any of the dates concerning McFarlane—against the passports. This paragraph of Schaap's affidavit refers generally to his efforts to verify "many dozens of names and dates and places," and it presents the passports merely as an additional source of information, not as his sole basis for confirming dates. Although the allegations about McFarlane all concern events before 1985, the book goes on to describe events after 1985 as well; Schaap can have used the passports in his possession to confirm only those later dates, but he could have used his "database searches" to check earlier ones. Moreover, the affidavit expressly details Schaap's efforts to verify the entire October Surprise story—and, more generally, Ben–Menashe's credibility—not the McFarlane allegations in particular; indeed, shortly after the statement quoted above, Schaap explains, "There were a number of things I was unable to verify, including the material that is the subject matter of this lawsuit." In context, therefore, the passage to which McFarlane points cannot reasonably be read either as demonstrating that Schaap was less than candid about the extent of his fact-checking or as an attempt to misrepresent the years covered by the passports in his possession.

■ Second, McFarlane alleges that Schaap lied when he made the following statement about his conversations with people who had relied upon Ben–Menashe in the past:

Prior to signing a contract with Mr. Ben–Menashe on February 25, 1992, and in the period immediately thereafter, I had general discussions with several people who were familiar with him and the assertions he had been making in the press in the several months preceding our first contact. I spoke with Mr. Hersh and Mr. Sick, and had extensive conversations with them later on. I spoke with Louis Wolf, a colleague and well-known researcher on intelligence-related matters. I spoke with Jane Hunter, the publisher of *Israeli Foreign Affairs.* I spoke with Joel Bleifuss, a reporter for *In These Times.* All of these people had published material that relied upon information from Mr. Ben–Menashe. While I did not, at this point, go into any of the details of the manuscript, I did ask for general opinions as to Mr. Ben–Menashe's knowledgeability and credibility. All of them confirmed that he appeared to be extremely knowledgeable and credible regarding Israeli intelligence matters.

In particular, McFarlane points out that Hunter later filed an affidavit in a case pending in the Southern District of New York in which she declared, under penalty of perjury: "I did use information obtained from Ari Ben–Menashe in my work. Mr. Schaap asked me about specific matters and I have no recollection of endorsing Mr. Ben–Menashe's general credibility. Indeed his credibility was an issue even after we had satisfied ourselves that he was a former intelligence officer." Although there does indeed appear to be a conflict between Hunter's and Schaap's recollections of their conversation, the conflict is so narrow that it appears to reflect only sloppiness and a slight over-generalization, not deceit, on the part of Schaap. Schaap's mentioning that he spoke with Hunter adds almost nothing to the face of the statement, and there is no dispute, regardless of whether she wants to characterize him as credible, that Hunter did "use information obtained from Ari Ben–Menashe in [her] work." The true conflict is simply too insubstantial to support the conclusion that Schaap perjured himself in his affidavit, nor does it cast enough doubt upon Schaap's credibility to raise a genuine issue of material fact.

## D. Duty to Retract

Finally, McFarlane argues that a jury could find evidence of actual malice in Sheridan Square's failure to retract or correct *Profits of War* after the Task Force issued its report discrediting Ben–Menashe's allegations. McFarlane presents no authority, however, nor are we aware of any, for the proposition that a publisher may be liable for defamation because it fails to retract a statement upon which grave doubt is cast after publication. In any event, if such a rule existed it would not likely apply in this case. The book notes that both Houses of Congress had begun to investigate the October Surprise allegations, and it reports (albeit critically) the interim findings of the House Task Force, which contradicted Ben–Menashe's allegation that President Bush attended the 1980 meeting in Paris. *PW* at 343–44. This disclosure clearly put the reader on notice that a final report of the Task Force would be forthcoming and that it might well take issue with Ben–Menashe's account. Accordingly, a later retraction or correction was not necessary in order to give the reader a full view of the controversy, and the publisher's failure to update the reader on the state of the controversy can hardly be taken as evidence that it published the book with actual malice.

## III. Conclusion

As we noted when McFarlane last came to this court looking for redress, "[t]he standard of actual malice is a daunting one." 74 F.3d at 1308. Few public figures have been able clearly and convincingly to prove that the scurrilous things said about them were published by someone with "serious doubts as to the truth of his publication." *St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325–26. Unfortunately for McFarlane, the best evidence to which he can point in support of his claim is the general controversy surrounding Ben–Menashe's credibility. Even that evidence, however, must be viewed in light of the reliance that other members of the press placed upon Ben–Menashe's story, the statements of reputable journalists that they had verified some of Ben–Menashe's allegations

(though none concerning McFarlane), and most important, Schaap's having witnessed Ben–Menashe make the very same allegations before the Congress under oath—and under the realistic threat of a penalty for perjury. So viewed, the evidence simply is not enough to prove, clearly and convincingly, that Sheridan Square published *Profits of War* with actual malice.

McFarlane's other arguments—that Schaap failed to contact anyone with first-hand knowledge of the alleged events, that he had been unable to corroborate the allegations about McFarlane, that he should (and may) have been aware of an inconsistency between Ben–Menashe's story and his passports, that he had been alerted that Ben–Menashe had not been present for a crucial meeting as reported in the book, and that he perjured himself in an affidavit submitted to the district court—each provides little or no additional support for a finding of actual malice; cumulatively, they do not amount to much, and surely not enough under the standard set by the Supreme Court. Because no reasonable jury could find that this evidence demonstrates, clearly and convincingly, that Sheridan Square published *Profits of War* with actual malice, the decision of the district court is

*Affirmed.*