**Aubrey ROBERTS, Plaintiff and Counter-Defendant,**

v.

**Mike DOVER, Defendant and Counter-Complainant.**

**Jerry David GIPSON, Jerome Beard, Richard Kelly, and Fred McAdoo, Defendants,**

v.

**Aubrey ROBERTS, Frank Cason, Tennessean Newspaper, Inc., and Wilson Freight Company, Counter-Defendants.**

**Civ. A. No. 80–3115.**

United States District Court, M. D. Tennessee, Nashville Division.

Sept. 28, 1981.

---

H. Tom Kittrell, Nashville, Tenn., for plaintiff and counter-defendant.

Kate W. Smith, Nashville, Tenn., for Dover.

Avon N. Williams, Jr., Nashville, Tenn., for Kelly.

Alfred H. Knight, III, Nashville, Tenn., for Tennessean and Cason.

J. Mark Rogers, Murfreesboro, Tenn., for Gibson.

Richard Dinkins, Nashville, Tenn., for Kelly.

Don L. Smith, Nashville, Tenn., for Wilson Freight Lines.

Eugene W. Ward, Nashville, Tenn., for McAdoo.

Jack Norman, Jr., Nashville, Tenn., for Beard.

## MEMORANDUM

JOHN T. NIXON, District Judge.

This case is pending before the Court on motions for summary judgment of counter-defendants, Albert Cason, Jr. (hereinafter Cason) and *The Tennessean.* Summary judgment on behalf of Cason and *The Tennessean* will be granted for the reasons discussed below.

This case arises out of a series of events involving a truck driver and several members of the Tennessee Highway Patrol who detained the driver and his rig on an interstate highway near Nashville. The truck driver, Aubrey Roberts, filed the initial complaint in this case under 42 U.S.C. § 1983 alleging violations of his constitutional rights and pendent state tort claims against defendant and counter-complainant Mike Dover (hereinafter Officer Dover) and other members of the state highway patrol involved in the incident.[1] Officer Dover filed a counter-claim for defamation against Roberts, Cason, and *The Tennessean.*

The basis of Officer Dover's counter-claim lies in statements Roberts made in a telephone interview with Cason, a reporter for Nashville's morning newspaper, *The Tennessean.* This interview subsequently appeared in an article written by Cason. Besides alleging that certain troopers stopped his truck and placed him in the back seat of a locked patrol car on a warm summer afternoon and turned on the automobile's heater, Roberts was also quoted in the article as attributing the cause of his stop and detention to comments he made about Officer Dover over his citizen's band radio. Specifically, the article quotes Roberts as saying that while driving down the highway, he viewed Officer Dover, a highway patrol helicopter pilot, answering the call of nature along the roadside. The article further quotes Roberts as saying that he commented on Officer Dover's activity on his citizen's band radio.[2] Roberts alleges in the article that Officer Dover, apparently angered by the comments, called Roberts a "smartass" over the helicopter's citizen's band radio and buzzed his truck in the helicopter as they proceeded down the highway. The exchange culminated in Roberts' being pulled over and detained by Officer Dover and the other troopers.

Officer Dover as counter-plaintiff alleges that Cason and *The Tennessean* defamed him by writing and publishing Roberts' claim that he viewed Officer Dover urinating along the interstate and Roberts' claim that Officer Dover used profane language over the citizen's band radio.

Officer Dover argues that he is not a public official within the meaning of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and therefore, need not prove actual malice in order to recover for the alleged defamation. Beginning with *New York Times Co. v. Sullivan, supra,* the Supreme Court strictly limited, as a matter of constitutional law, the right of a public official to recover for alleged defamation relating to his official conduct. The Court formulated what has become known as the *New York Times* rule:

> The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice" —that is, with knowledge that it was false or with reckless disregard of whether it was false or not. *Id.* at 280–281, 84 S.Ct. at 726.

To come within the *New York Times* rule, two prerequisites must be met: (1) the individual asserting the defamation must have the status of a "public official" or an equivalent status, and (2) the defamation must relate to the public officer's official conduct.

---

1. A voluntary non-suit was entered as to defendant Fred McAdoo, an employee of the Tennessee Public Service Commission.

2. Roberts' quote reads, "I didn't say much, you understand. I just said something like, 'you know, if that was one of us out there (truckers' slang for urinating) like that we'd be taken down for Indecent Exposure (sic)' ". (Exhibit 1, Answer and Counter-Complaint of Mike Dover).

■ These two requirements will be addressed in turn. The initial issue is whether Officer Dover, a Tennessee State Highway Patrolman is a public official within the meaning of the *New York Times* rule. In *Rosenblatt v. Baer*, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), the Supreme Court in discussing the concept of "public officials" stated:

> The thrust of New York Times is that when interests in public discussion are particularly strong, as they were in that case, the Constitution limits the protections afforded by the law of defamation. Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performances of all government employees, both elements we identified in *New York Times* are present and the *New York Times* malice standards apply. *Id.* at 86, 86 S.Ct. at 676. [Footnote omitted]

Furthermore,

> [T]he "public official" designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs. *Id.* at 85, 86 S.Ct. at 675. [Footnote omitted].

However, the definition of public official is not necessarily limited to those positions of well-paid or highly visible administrators. Justice Henry in *Press, Inc. v. Verran*, 569 S.W.2d 435 (Tenn.1978), found a junior social worker in the Tennessee Department of Human Services to be a public official within the confines of the *Rosenblatt* definition. He stated that the rule,

> [D]oes not necessarily apply only to high public position. Any position of employment that carries with it duties and responsibilities affecting the lives, liberty, money or property of a citizen or that may enhance or disrupt his enjoyment of life, his peace and tranquility, or that of his family, is a public office within the meaning of the constitutional privilege. *Id.* at 441.

As the definition of public official has evolved, numerous courts have recognized that police officers are vested with great responsibility and, concurrent with that responsibility, such tremendous power over our daily lives that they fall within the category of public officials.[3] Unquestionably, the public has an important and special interest in the qualifications and performance of highway patrolmen such as Officer Dover, whose decision-making potentially affects the liberty of each of us. Certainly, Roberts viewed Officer Dover as "the very epitome of government". *Press, Inc. v. Verran*, 569 S.W.2d at 443.

The second issue to be addressed is whether the alleged defamation related to Officer Dover's official conduct. Clearly, the story reported by *The Tennessean* did relate to the trooper's official conduct. In all of Officer Dover's actions, he was clothed with the authority of the State of Tennessee. The allegedly defamatory statements reflected upon the propriety of his public conduct as an officer and allegedly triggered a series of events involving police misconduct.

> The public-official rule protects the paramount public interest in a free flow of information to the people concerning public officials, their servants. To this end, anything which might touch on an official's fitness for office is relevant. *Garrison v. Louisiana*, 379 U.S. 64, 77, 85 S.Ct. 209, 217, 13 L.Ed.2d 125 (1964).

3. *Meiners v. Moriarty*, 563 F.2d 343 (7th Cir. 1977); *Rosales v. Eloy*, 122 Ariz. 134, 593 P.2d 688 (1979); *Moriarty v. Lippe*, 162 Conn. 371, 294 A.2d 326 (1972); *Coursey v. Greater Niles Township Publishing Corp.*, 40 Ill.2d 257, 239 N.E.2d 837 (1968); *Delia v. Berkey*, 41 Md.App. 47, 395 A.2d 1189 (1978), *aff'd.* 287 Md. 302, 413 A.2d 170 (1980); *NAACP v. Moody*, 350 So.2d 1365 (Miss.1977); *Scelfo v. Rutgers Univ.*, 116 N.J.Super. 403, 282 A.2d 445 (1971); *Orr v. Lynch*, 401 N.Y.S.2d 897, 60 A.D.2d 949 (1978), *aff'd.*, 45 N.Y.2d 903, 411 N.Y.S.2d 10, 383 N.E.2d 562 (1978); *Starr v. Beckley Newspapers Corp.*, 157 W.Va. 447, 201 S.E.2d 911 (1974).

The community has a significant interest in having access to information that concerns the abuse of power by its police officers, the very individuals expected to protect each individual from the abuses of others.

■ As a public official under the *New York Times* rule Officer Dover can recover against the defendants Cason and *The Tennessean* only if he is able to prove with convincing clarity that the allegedly defamatory statements contained in the news story were made with actual malice—that is, with knowledge that they were false. Unless there is sufficient evidence from which a jury could infer deliberate falsification or reckless publication despite the publisher's awareness of probable falsity, the First Amendment precludes recovery in a defamation action by a public official. *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 153, 87 S.Ct. 1975, 1990, 18 L.Ed.2d 1094 (1967) (opinion of Mr. Justice Harlan). In *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), the Supreme Court stated:

> These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

The facts in this case must be examined to determine if summary judgment should be granted in light of these guidelines for First Amendment protections articulated in *New York Times* and its progeny. If there are disputed issues of material fact from which a jury could infer actual malice, summary judgment on behalf of Cason and *The Tennessean*, is improper. However, if the undisputed material facts would permit no inference of actual malice, summary judgment should be granted. Although summary judgment must be exercised cautiously where issues are raised concerning a party's subjective state of mind, state of mind is not always a jury question. *Washington Post Company v. Keogh*, 365 F.2d 965 (D.C. Cir.1966), *cert. denied*, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967).[4]

Officer Dover's counter-complaint states:

The Countercomplainant alleges that at the time Frank Cason and Tennessean Newspaper, Inc. made and caused to be published the libelous statements in the article and more particularly described in paragraph 3 of this Countercomplaint, Cason and the Tennessean Newspaper, Inc. could have and should have ascertained that the statements were false before publishing said information, and Cason and the Tennessean Newspaper, Inc. carelessly and recklessly failed to ascertain the reliability of the Counterdefendant Roberts and the feasibility of the allegations he made, and disregarded the Countercomplainant's denial of the allegations, and thereby negligently published false and libelous information about the Countercomplainant on the front page of *The Tennessean* newspaper on the morning of June 25, 1979, thereby directly and proximately causing said injuries to the Countercomplainant's repu-

---

4. A Court cannot ignore clear facts regarding the research and preparation of an article which refute an actual malice claim. *Schultz v. Reader's Digest Association*, 468 F.Supp. 551, 554 (E.D.Mich.1979). Courts have held that First Amendment considerations make summary judgment the most appropriate mechanism for disposing of defamation claims where the plaintiff has not proved with convincing clarity, when confronted with the motion, the existence of elements with sufficient probative substance to provide a basis for a finding that a defendant had knowledge of falsehood or serious doubts as to the truth of the allegedly defamatory statements. *F & J Enterprises v. Columbia Broadcasting System, Inc.*, 373 F.Supp. 292, 297–298 (N.D.Ohio 1974); *Cerrito v. Time, Inc.*, 302 F.Supp. 1071 (N.D.Cal.1969), *aff'd*. per curiam, 449 F.2d 306 (9th Cir. 1971). The primary consideration for requiring a more rigid compliance with the requirements of Rule 56(e) on the part of the plaintiff lies in the chilling effect that long and expensive trials would have on the defendant's First Amendment rights. *Time, Inc. v. McLaney*, 406 F.2d 565, 566 (5th Cir. 1969), *cert. denied*, 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969).

tation, employment, and said physical and mental pain, auguish (sic), humiliation, embarrassment and other damages as set forth in this Countercomplaint. (Counter-complaint ¶ 8).

Although this appears to allege only the recklessness standard of actual malice, the plaintiff's reply brief in opposition to the motions suggests that there is evidence that Cason actually knew of the falsity of the report. (Counter-Complainant's Reply Brief p. 9). It would seem proper for the Court to consider on this motion whether there is evidence of actual malice under either the deliberate falsehood or recklessness standards.

■ In his deposition, Cason testified that while working general assignment on *The Tennessean* city desk on the night of June 23, 1979, he took a telephone call from Aubrey Roberts. (Cason's dep. p. 11). Roberts identified himself as a truck driver and related the series of events inferring alleged misconduct on the part of several Tennessee Highway Patrol Officers earlier that day when his truck was stopped on interstate highway, I–65 North. (Cason's dep. pp. 11–17). The allegedly defamatory statements which Roberts related to Cason, that he had observed Officer Dover urinating next to his helicopter along the interstate and that Officer Dover called him a "smartass" over the C.B. Radio, were, according to Roberts, the initial events which preceded his subsequent stop and detention along the roadside by several state troopers. Cason further testified that he was not acquainted with Roberts prior to the telephone call, nor did he attempt to investigate Roberts' background or interview him in person. (Cason's dep. pp. 18–19). The telephone interview with Roberts was approximately one hour long. (Roberts' dep. p. 131). Cason testified that he found Roberts' story credible because he sounded genuinely upset and angry and because he thought it would be difficult for someone to make up such a series of events and relate them so easily. (Cason's dep. p. 33). Cason stated that he believed the story newsworthy because it contained a citizen's claim that he had been abused by police.

(Cason's dep. p. 34). Cason testified that he and his city editor decided to delay running the story in order to get Officer Dover's version of the events. (Cason's dep. p. 44). Cason stated that they planned on running the story after talking to Officer Dover. (Cason's dep. p. 48). Cason contacted Officer Dover by telephone the next day and obtained his version of the events which, essentially, contradicted that of Roberts. Officer Dover denied urinating beside his helicopter and claimed that Roberts, not he, used foul language on the C.B. Radio. (Cason's dep. pp. 21–22). Cason testified that he encouraged Officer Dover to respond to Roberts' charges because the newspaper planned on running the story. (Cason's dep. p. 22). Cason stated that he found Officer Dover less credible in the interview than Roberts, in part, because Officer Dover asserted that Roberts had been stopped for speeding but would not comment on why Roberts was not ticketed for speeding. (Cason's dep. p. 35).

Cason testified that he had previously reported on alleged incidents of police misconduct during his career with the newspaper. (Cason's dep. pp. 24–26). He further stated that he had received five or six traffic citations, one of which he felt may not have been deserved, and that he had been arrested once for driving under the influence. (Cason's dep. pp. 26–28). Roberts, in his deposition, related essentially the same facts as Cason regarding the telephone interview except that Roberts testified that Cason advised him to contact an attorney and file a complaint with Officer Dover's supervisors. Cason denied offering such advice. (Roberts' dep. p. 77, Cason's dep. pp. 23, 35). In addition to calling Officer Dover to obtain his version of the events, Cason testified that he made an unsuccessful effort to learn the identity of a state official who allegedly inspected Roberts' truck while it was stopped on the roadside. (Cason's dep. p. 20). Cason could not recall trying to contact any troopers other than Officer Dover who were involved in the incident. He also could not recall whether

Roberts supplied the names of the other troopers. (Cason's dep. pp. 18, 20). Roberts also testified in his deposition that Cason called him back prior to publication of the news story and related Officer Dover's version of the events (Roberts' dep. p. 132) and furthermore, that a *Tennessean* photographer came to his home to take a picture for publication with the article. (Roberts' dep. pp. 77–78).

Application of the *New York Times* standard to the undisputed facts recited above requires granting of summary judgment on behalf of *The Tennessean* and Cason. No material facts are disputed, nor, indeed, are there any that are undisputed, from which a jury could infer that the news story in question was published with actual malice.

There is no evidence that Cason actually believed that Roberts' allegations were false, as a whole, or as to the allegedly defamatory statements at the time the story was written and published. Contrary to the suggestion in Officer Dover's brief, nothing in the record indicates that Cason sought revenge for past traffic violations and a D.U.I arrest by writing an article containing deliberately false allegations. Certainly, the fact that Officer Dover denied urinating beside the road and using foul language on the C.B. Radio could not be sufficient, standing alone, to sustain an inference that Cason knew Roberts' charges of such conduct were false. This denial was included in the article and the disputed issue as to whether Cason advised Roberts to see an attorney and file a complaint is immaterial in that neither version would support an inference of actual malice on the part of Cason.

▮ Likewise, there is no evidence from which a jury could find actual malice under the recklessness standard of *New York Times* and subsequent cases. Mere negligence in investigation by a reporter and unfortunate errors in judgment do not alone rise to the level of reckless disregard. *See, St. Amant v. Thompson, supra; Time,*

*Inc. v. Pape,* 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971). In order for the Court to permit this issue to proceed to trial there would have to be some evidence from which the fact finder could infer that Cason in fact had serious doubts as to the truth of Roberts' allegations but published them anyway without further investigation. Clearly, no such evidence exists in the record. Cason's reasons for believing Roberts' version of the events and finding Officer Dover's version less credible are undisputed. Through the interview with Officer Dover, Cason established that a series of events involving a stop of Roberts' truck and his detention along the road did occur about the time and place Roberts alleged even if the details related in each version varied. By sending a photographer to Roberts' house and calling him back to relate Officer Dover's version of the events, Cason verified Roberts' identity and provided him an opportunity to recant.

Officer Dover's denials would not support an inference that Cason acted with reckless disregard in writing a story containing both versions rather than withholding the story altogether. Cason believed the story was newsworthy because it contained a citizen's charges of police misconduct. To require that a reporter withhold such a story or face potential liability for defamation because a police officer denies a citizen's allegation of misconduct is exactly the type of self-censorship the *New York Times* rule was intended to avoid. It is not unusual for citizens who believe they have been victims of police misconduct and the police officers involved to have widely varying versions of the events. A journalist in Cason's position is permitted under the *New York Times* standard to exercise his judgment in favor of publication without fear of civil liability. A rule to the contrary would unnecessarily restrict the ability of the press to perform in its constitutionally protected role as a guardian against possible abuses of power.

Cason's conduct in this case was clearly above the minimum standards found ac-

ceptable in important defamation decisions of the Supreme Court. In *St. Amant v. Thompson, supra,* the defendant, a candidate for public office, made charges against the plaintiff in a televised speech based solely upon an unverified affidavit of an individual whose reputation for veracity was not established. The defendant not only failed to confront the subject of the accusation and report his denial, but he testified that he gave no consideration to whether the statements defamed the plaintiff. Cason at least contacted Officer Dover, evaluated his credibility in comparison with Roberts, and published the trooper's side of the story. Thus, Cason went significantly beyond the standard of conduct entitling the defendant to First Amendment protection in *St. Amant v. Thompson, supra.* In *Time, Inc. v. Pape, supra, Time* magazine published charges of police brutality that a plaintiff had made in a civil suit as if they were findings of the United States Commission on Civil Rights rather than mere allegations. The Supreme Court held that the magazine's misrepresentation of the source of the charges, omissions of the word "alleged", and failure to contact the subject of the accusation did not create a jury question regarding actual malice.

In the present case, Cason made none of the errors alleged in *Time, Inc. v. Pape, supra.* Not only did Cason contact the subject of the accusations and report his denial, but the story makes it clear that Roberts was relating his version of the events.[5]

Finally, Officer Dover's extensive reliance on *Curtis Publishing Company v. Butts, supra,* is misplaced. The plaintiff entitled to recovery in *Butts* was an athletic director at a state university who was not considered a public official under state tort law. The Supreme Court reasoned that Butts was not a public official but rather a public figure and, therefore, that the defendant would not be entitled to the rigorous protection of the *New York Times* standard. *Curtis Publishing Company v. Butts, supra,* 388 U.S. at 154–155, 87 S.Ct. at 1991. Thus, a comparison of the defendant's conduct in *Butts* to Cason's actions in this case is not particularly instructive.[6]

Officer Dover points to other avenues of investigation that Cason and *The Tennessean* failed to pursue prior to publication as evidencing actual malice such as contacting other state troopers allegedly involved or visiting the scene of the events. Indeed, such efforts might have resulted in a better news story. However, it cannot be said on this record that any failure of Cason or *The Tennessean* to make such further prior investigation constitutes proof sufficient to present a jury question on actual malice. *See, Beckley Newspapers Corp. v. Hanks,* 389 U.S. 81, 84–85, 88 S.Ct. 197, 199–200, 19 L.Ed.2d 248 (1967); *Schultz v. Reader's Digest Association, supra,* 468 F.Supp. at 564. Summary judgment will, therefore, be entered in favor of Cason and *The Tennessean* on Officer Dover's defamation claim.

In addition to the defamation claim, Officer Dover's counter-complaint avers a claim for wrongful invasion of privacy against Cason and The Tennessean.

> Countercomplainant further avers that by making and causing to be published wrongful, inaccurate and false state-

---

5. In concluding that Cason and *The Tennessean* are entitled to summary judgment under the *New York Times* standard, the Court need not consider the applicability of the neutral reportage privilege applied in *Edwards v. National Audubon Society,* 556 F.2d 113, 120 (2nd Cir. 1977), *cert. denied,* 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977).

6. The Court stated in *Butts*:
   > We consider and would hold that a "public figure" who is not a public official may also recover damages for a defamatory falsehood whose substance makes substantial danger to reputation apparent, on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers. (Cite omitted) *Id.* at 155.

   Were this Court to consider the conduct of the reporter in this case in light of this standard and the defendant's conduct in *Butts,* the result would not be different.

ments charging the Countercomplainant had committed acts which were criminal and inconsistent with the professional and personal standards of the Countercomplainant, the Counter-defendants, Aubrey Merel Roberts, Frank Cason, Wilson Freight Company, and Tennessee Newspaper, Inc., (sic) wrongfully invaded the privacy of the Counter-complainant, thereby directly and proximately causing him to suffer extreme physical, mental and emotional pain, anguish, embarrassment and humilation as a result of said publication and exposure of his name and business address in connection with the newspaper report of an alleged unlawful act or acts which were the fabrication of the counterdefendant Roberts, thus subjecting the Countercomplainant to undesired notoriety, adverse publicity and affected his standing in the public light which injured his sensitivities and feelings and have made him the victim of repeated cruel jokes and have caused the formerly friendly public to shy away from the Counter-complainant, and otherwise damaged him. (Counter-complaint ¶ 9).

The counter-complaint states a claim for invasion of privacy which consists of publicity placing the victim in a false light in the public eye.[7] The constitutional privilege of *New York Times* was extended by the Supreme Court in *Time v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) to include invasion of privacy actions.[8] In *Cox Broadcasting Corporation v. Cohn*, 420 U.S. 469, 490, 95 S.Ct. 1029, 1043, 43 L.Ed.2d 328 (1975), the Court stated:

> Similarly, where the interest at issue is privacy rather than reputation and the right claimed is to be free from the publication of false or misleading information about one's affairs, the target of the publication must prove knowing or reckless falsehood where the materials published, although assertedly private, are "matters of public interest." *Time, Inc. v. Hill, supra*, 385 U.S. at 387–388, 87 S.Ct. at 541–42. [footnote omitted].

■ Thus, the analysis to be applied in determining the extent of the constitutional privilege in regard to Officer Dover's invasion of privacy claim is the same as that undertaken above in considering the defamation action.[9] As that analysis indicates, there is no evidence from which a jury could infer invasion of Officer Dover's privacy by publication of a knowing and reckless falsehood. If the conduct of Cason and *The Tennessean* was adequate to afford them the protection of the constitutional privilege against the defamation claim, such conduct is clearly sufficient to entitle them to the same degree of protection against this invasion of privacy claim. For these reasons, summary judgment will be granted on behalf of Cason and *The Tennessean* as to Officer Dover's action for wrongful invasion of privacy.

---

7. See, Prosser, Torts §§ 812–814 (4th Ed. 1971)

8. Although the Court stated in *Time v. Hill* that the *New York Times* standard was being applied only in the context of the state privacy statute, this has been interpreted as providing a constitutional privilege in privacy actions generally through application of the *New York Times* rule. *See*, Prosser, *supra*, § 118 pp. 823–830.

9. *Time, Inc. v. Hill, supra*, involved application of the *New York Times* standard where the published materials concerned matters of public interest. Such application certainly seems proper in this case when the plaintiff in a privacy action is a public official, as was the plaintiff in the *New York Times* case, and the published article concerns allegations of official misconduct.