[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 494 
Edward W. Smith appeals from a summary judgment in favor of The Huntsville Times Company, Inc. ("the Times"), and David Person, an editorial writer for the Times, in Smith's defamation action against them. We affirm.
On October 27, 2000, the Times published on its editorial page the following "Commentary" written by Person:
"COMMENTARY
"Can Glen Park residents believe in the badge?
 "She said he called her a prostitute, a low-life and a nigger. She said he cursed her, using the five-letter word for a female dog.
 "She is Helen Griffin, a resident of the Glen Park neighborhood in northwest Huntsville. He is Edward Smith, a crime scene investigator assigned to the north precinct of the Huntsville Police Department.
 "But they weren't at a crime scene when this alleged incident took place. They were, she said, in front of her home.
 "And she, while far from perfect, said that she had committed no crime. That's why she filed a complaint against Smith with the police department. It's also why she and more than 20 of her neighbors and friends have signed a petition protesting what they say has been Smith's `dishonorable and unethical conduct.'
 "`It ain't supposed to be that way with a police officer,' Griffin said.
 "Attempts to contact Smith through the police department were unsuccessful.
 "Helen Griffin describes herself as a 46-year-old, retired licensed practical nurse who is church-going and community-oriented. She also said she's enrolled in the R.N. program at Calhoun Community College. *Page 495 
 "`Basically, I'm just a normal person,' she said. `I'm not a bad person.'
 "But Griffin admits that she was charged with driving under the influence of alcohol four or five years ago. She also concedes that she's been convicted of assault on two occasions.
 "But those mistakes had nothing to do with what she said happened the night of Oct. 5 when she got home from class. She got out of her car and was on her way to the duplex apartment next to hers. Robert Brooks lives there. He said he was standing out on his porch at the time and confirms her account.
 "Officer Smith, who is assigned to the north precinct right down the street, was standing on the lawn of the apartment building next door when she drove up. It's not clear if he was on duty at the time.
 "But he was, Griffin said, wearing street clothes except for a dark blue jacket that has `Police' in big, white letters on the back. Smith saw her, she said, and began shouting obscenities and racial epithets at her. She was embarrassed and hurt.
 "`He don't even know me,' she said. `He just saw a black woman.'
 "On Oct. 9, Griffin and John Lavender, her brother and a local minister, went to the police department. They met with Deputy Chief Col. Leon Schenck, and he directed her to Internal Affairs where she filed her complaint.
 "`That would definitely be conduct unbecoming a police officer,' Schenck said regarding Griffin's complaint. `Assuming those statements were made.'
 "If the Internal Affairs investigation concludes that Smith did indeed make those statements, it's unclear what penalty he would face. Schenck said that disciplinary actions are determined case by case.
 "But true or false, this much is clear: Helen Griffin and more than 20 petitioners believe that Smith has mistreated them or their neighbors in the Glen Park neighborhood, been abusive and acted in an unethical way. They are concerned. Some are afraid.
 "Citizens — whether their community is rich or poor, black or white — need to know that the police can be trusted. They need to know that they can believe in the badge.
 "And they need to know that those charged to serve and protect them don't see them as less than human."
(Emphasis added.) In October 2000, Smith owned and leased a number of "residential duplex buildings" in Glen Park.
On July 27, 2001, Smith filed a three-count complaint against the Times and Person. The counts alleged (1) "defamation/libel," (2) "false light invasion of privacy," and (3) "defamation involving profession." The Times and Person moved for a summary judgment on the ground that Smith is a "public official," and, therefore, that the defendants are entitled to the constitutional protection recognized in New York Times Co. v. Sullivan,376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In its judgment granting the motion, the trial court stated, in part:
 "This court finds that [Smith], as a police officer, is a public official under the holding of [New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)]. This court follows the vast majority of courts in holding that law enforcement officers are public officials. See Williams v. Marcum, 519 So.2d 473 (Ala. 1988); Hailey v. KTBS, Inc., 935 S.W.2d 857, 860-61 (Tx.Ct.App. 1996). The court further finds that all of plaintiff's claims must be analyzed under the constitutional protections *Page 496 
enunciated under the New York Times v. Sullivan
doctrine. See e.g., Hustler v. Falwell, 485 U.S. 46[, 108 S.Ct. 876, 99 L.Ed.2d 41] (1988).
 "As a public official, the plaintiff must present clear and convincing evidence of actual malice in order to defeat the summary judgment motion filed by the defendants. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 [, 106 S.Ct. 2505, 91 L.Ed.2d 202] (1986); White v. Mobile Press Register, 514 So.2d 902, 904 (Ala. 1987). The plaintiff has failed to present such evidence, and summary judgment is therefore appropriate on the plaintiff's claims."
The principal issues Smith raises on appeal are whether the actual-malice standard applies to his claims, and, if so, whether the evidence he produced in opposition to the summary-judgment motion provided sufficient evidence of actual malice.
 I. Applicable Standard
The threshold question whether the actual-malice standard applies in a defamation action involves a two-pronged inquiry — whether the defendant is a public official and, if so, whether the allegedly defamatory comments related to his conduct as a public official.[1] This is so, because "the Constitution protects statements made about public officials when those statements concern `anything which might touch on an official'sfitness for office. . . .'" Soke v. Plain Dealer,69 Ohio St.3d 395, 397, 632 N.E.2d 1282, 1284 (1994) (quoting Garrisonv. Louisiana, 379 U.S. 64, 77, 85 S.Ct. 209, 13 L.Ed.2d 125
(1964)) (emphasis added); see Roberts v. Dover,525 F.Supp. 987, 989 (M.D.Tenn. 1981). This formulation includes "personal attributes," regardless of whether they "may also [reflect] the official's private character." Garrison, 379 U.S. at 77,85 S.Ct. 209. This is so, because "[f]ew personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation." Id. Thus, the first prong concerns the defamation plaintiff's status, while the second prong concerns the "nexus between that position and the conduct that is the subject of the defamation." Note, The Status/Conduct Continuum:Injecting Rhyme and Reason into Contemporary Public OfficialDefamation Doctrine, 84 Va. L.Rev. 871, 874 (1998) (emphasis added). Such threshold determinations are questions of law for the court. See Ex parte Rudder, 507 So.2d 411, 416 (Ala. 1987);Fulton v. Advertiser Co., 388 So.2d 533, 536 (Ala. 1980).
Smith does not contend that the first prong of the public-official analysis is not satisfied. He does not argue, in other words, that a police officer is not a public official for defamation purposes. See St. Amant v. Thompson, 390 U.S. 727,730, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) (accepting "the determinations of the Louisiana [state] courts" that a deputy sheriff who was a plaintiff in a defamation action was a "public official"); Hailey v. KTBS, Inc., 935 S.W.2d 857, 860
(Tex.Ct.App. 1996) (stating that "[l]aw enforcement personnel are almost universally held to be `public officials,'" and citing more than 50 defamation cases involving police officers or related law-enforcement personnel). He states, however, that he was "not on duty" *Page 497 
at the time the incident in the Commentary is alleged to have occurred, and, therefore, that "Person's article defamed [him] in his private business." Smith's brief, at 28-29. "The alleged actions . . . which were the subject of Person's article were," he insists, "all actions connected to his private business as a landowner and landlord in the Glen Park area of Huntsville." Smith's brief, at 29. Thus, Smith contends, the allegedly defamatory statements were "not related to his `official conduct,'" for the purposes of the second prong of the public-official analysis. Smith's brief, at 28 (Smith's emphasis). We disagree.
The Commentary never mentions Smith's status as a property owner or as a landlord. It does, however, make frequent references to Smith's status as a police officer. Indeed, the Commentary is titled: "Can Glen Park residents believe in thebadge?" (Emphasis added.) Nothing in the Commentary apprises the reader that Smith owns property in the neighborhood or suggests that Griffin's allegations relate in any manner to real estate. Indeed, the Commentary suggests no reason for Smith's presence in Glen Park, other than as a police officer.
The fallacy of Smith's argument is further reflected by the procedural history underlying the dispute. A few days after the alleged incident, Griffin and her brother, Lavender, visited the Huntsville Police Department ("the Department") and filed a complaint against Smith. Her complaint alleged, among other things, that on the evening of October 5, 2000, Smith yelled derogatory accusations at her, accusing her of prostitution and disparaging her ethnicity. Smith did this, Griffin alleged, "tomisrepresent his power in the community and ridicule [her] in front of many people." (Emphasis added.) Griffin's complaint also alleged that on an earlier occasion, while she and a friend were sitting in her yard, Smith approached them in his automobile and stared at them from the car for approximately 10 minutes, "trying to intimidate [them] with his power." (Emphasis added.)
On the basis of Griffin's complaint, the Department initiated an investigation of the allegations against Smith. During the investigation, Lavender submitted to the Department documents styled "Petition Against Officer Edward Smith" ("the petition"). The petition, which contained 28 signatures, stated:
 "I, resident of Glen Park community do hereby petition the dismissal of Mr. Edward Smith from the Huntsville City Police Force for reasons of dishonorable and unethical conduct towards citizens of the Glen Park community. I have signed my name to protest Mr. Smith's conduct and violation of my rights and or the rights of my neighbors and family and request that an immediate restraining order be place[d] on officer Smith from working, patrolling, or entering the Glen Park community."
(Emphasis added.)
During the Department's investigation, Smith submitted a statement regarding his version of the relevant events. In his statement, Smith admitted that he was present at the time and place alleged in Griffin's complaint, but he denied seeing Griffin or directing any remarks at her. He stated that he went to the location in response to "complaints from tenants on property that [he owned]. The complaint was that Robert (Moody) Brooks was allowing prostitutes to stand in front of his residence." Also, he "told [Brooks], who had already admitted to [Smith] that he was selling drugs and allowing prostitutes in his residence, that this was going to stop." *Page 498 
The result of the Department's investigation was contained in an "office memorandum" to the chief of police, dated December 14, 2000 ("the memorandum"). The memorandum stated, in part:
 "Griffin alleged [that] Investigator Smith was responsible for the `heavy patrolling' and `checkpoints' in her neighborhood in which `white motorists' were allowed to `pass through.' . . . By allowing Investigator Smith to go unpunished for his actions, Ms. Griffin alleged, the Huntsville Police Department would be condoning racially motivated practices from its officers. She concluded by saying the department should be hiring more black officers to patrol the black communities."
(Emphasis added.) Ultimately, however, the Department dismissed Griffin's complaint, finding that "a reasonable person [could] conclude the allegations made, not only against Investigator Smith, but the department as a whole, by Ms. Helen Griffin, [were] UNFOUNDED and merit no further investigation." (Capitalization original; emphasis added.)
On these undisputed facts, it is clear that it was Smith's alleged official conduct that lay at the heart of the criticisms contained in the Commentary. Indeed, Person testified by deposition that his Commentary was prompted by the filing of Griffin's complaint. Reduced to its core, Griffin's complaint, as supplemented by the residents' petition, alleged discriminatory law enforcement by Smith, and, more generally, by the Department. Her complaint alleged that Smith's activities were motivated by his desire to exercise "his power." The petition requested that the Department restrain "Smith from working, patrolling, or entering the Glen Park community." The Department's memorandum described Griffin as objecting to "heavy patrolling and checkpoints," which Smith allegedly instigated to discriminate against black motorists in the community. Those allegations were unrelated to Smith's status as a landowner.
Smith asserts that he was off duty at the time of the alleged incident, and urges us to attach considerable — if not dispositive — significance to that assertion. We decline to do so. In a meeting between Smith and Person on January 16, 2001, Smith downplayed the significance of his alleged off-duty status.[2] He stated: "I will enforce the law off duty, if I'm out there, and have made several arrests out there for fighting off duty." Indeed, he admittedly went into the neighborhood at the time of the alleged incident — in response to "complaints" — to warn Brooks against selling drugs and "allowing prostitutes in his residence." While doing so, he wore a jacket identifying him as a policeman. Because Smith's status as a police officer was widely known throughout the community, and because of his admitted practice of blurring the distinction between his private conduct and his law-enforcement activities, the assertion — assuming it to be a fact — that he was "technically" off duty is of little consequence.
Person's Commentary echoed the sentiments of Griffin's complaint and the petition. The purpose of the Commentary was to point out problems in the manner in which Glen Park residents perceived "those charged to serve and protect them," based on the conduct attributed to Smith. Racial discrimination in law enforcement — real or perceived — was the overriding theme of the Commentary. *Page 499 
Clearly, racial animus in law enforcement is an example of "improper motivation," Garrison, 379 U.S. at 77, 85 S.Ct. 209, and an allegation of such racial animus is the epitome of protected speech. New York Times v. Sullivan, supra (holding that allegations that the police commissioner engaged in racist police tactics were protected). Thus, we have no difficulty in deciding that the criticisms in the Commentary "touch on [a public] official's fitness for office." Cf. Johnson v. CapitalCity Press, Inc., 346 So.2d 819, 820-21 (La.Ct.App. 1977) (allegation that the chairman of the Louisiana Board of Highways engaged in "intimidating business tactics" in his "private business" invoked the public-official privilege); Westhouse v.Biondo, 990 S.W.2d 68, 71 (Mo.Ct.App. 1999) (defamation defendant's allegations that a customs official "circumvent[ed] airport security when not on official business and . . . lied to defendant's fellow employees that he needed to locate defendant regarding official customs matters" were "clearly" relevant to the official's "fitness for office"); Shafer v. Lamar Publ'gCo., 621 S.W.2d 709, 711 (Mo.Ct.App. 1981) (although allegation that a police officer impregnated a 16-year-old girl "may have referred to private conduct, it certainly bore on [the officer's] fitness for office"); Soke v. Plain Dealer,69 Ohio St.3d at 398, 632 N.E.2d at 1283-84 (statements made by a police officer to his nephew, the suspect in a murder investigation, not to cooperate with police "were relevant to [the officer's] fitness and competence to be a police officer"); Tomkiewicz v. DetroitNews, Inc., 246 Mich.App. 662, 674, 635 N.W.2d 36, 44
(publication misidentifying a police officer as one who stalked and harassed a former lover was "relevant to [the officer's] fitness for office"); Colombo v. Times-Argus Ass'n,135 Vt. 454, 455, 380 A.2d 80, 82-83 (1977) (allegation linking a police officer to "distribution of a police photo of a nude college student `streaker'" was "related to the [officer's] official conduct"). Because the public-official privilege is applicable, Smith bears the burden of demonstrating actual malice.
 II. Actual Malice
"In a [defamation] action brought by a public figure, summary judgment for the defendant is appropriate unless the plaintiff produces the clear and convincing evidence that a reasonable jury would need in order to find that the defendant published the defamatory material with actual malice." McFarlane v. SheridanSquare Press, Inc., 91 F.3d 1501, 1508 (C.A.D.C. 1996); seeFinebaum v. Coulter, 854 So.2d 1120, 1128-29 (Ala. 2003). "[T]here is no genuine issue [of material fact] if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence." Anderson v. LibertyLobby, Inc., 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202
(1986); see also Pemberton v. Birmingham News Co.,482 So.2d 257, 259-60 (Ala. 1985).
This standard is satisfied by proof that a false statement was made "`with knowledge that it was false or with reckless disregard of whether it was false or not.'" Harte-HanksCommunications, Inc. v. Connaughton, 491 U.S. 657, 659,109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (quoting New York Times v.Sullivan, 376 U.S. at 279-80, 84 S.Ct. 710). A defendant acts with "reckless disregard" if, at the time of publication, the defendant "`entertained serious doubts as to the truth of [its] publication' or acted `with a high degree of awareness of . . . [its] probable falsity.'" McFarlane, 91 F.3d at 1508 (quotingSt. Amant, 390 U.S. at 731, 88 S.Ct. 1323) (emphasis added). "The actual malice standard is subjective; the plaintiff *Page 500 
must prove that the defendant actually entertained a serious doubt." Id. (emphasis added). See Sanders v. Smitherman,776 So.2d 68, 71 (Ala. 2000); Finebaum, 854 So.2d at 1124; see alsoRevell v. Hoffman, 309 F.3d 1228, 1233 (10th Cir. 2002);Flowers v. Carville, 310 F.3d 1118, 1131 (9th Cir. 2002);Chafoulias v. Peterson, 668 N.W.2d 642, 654 (Minn. 2003).
Malice can be shown by circumstantial evidence showing, for example, "that the story was (1) `fabricated,' (2) `so inherently improbable that only a reckless man would have put [it] in circulation,' or (3) `based wholly on' a source that the defendant had `obvious reasons to doubt,' such as `an unverified anonymous telephone call.'" McFarlane, 91 F.3d at 1512-13 (quoting St. Amant, 390 U.S. at 732, 88 S.Ct. 1323). However, malice cannot be "measured by whether a reasonably prudent man would have published, or would have investigated before publishing." St. Amant, 390 U.S. at 731, 88 S.Ct. 1323
(emphasis added). Indeed, the failure to investigate does not constitute malice, unless the failure evidences "`purposeful avoidance,'" that is, "an intent to avoid the truth." Sweeney v.Prisoners' Legal Servs., 84 N.Y.2d 786, 793, 647 N.E.2d 101,104, 622 N.Y.S.2d 896, 899 (1995) (quoting Connaughton,491 U.S. at 693, 109 S.Ct. 2678); see Gertz v. Robert Welch, Inc.,418 U.S. 323, 332, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).
Smith contends that he has presented evidence of actual malice. In particular, he asserts that the "defendants published the [Commentary] with knowledge that at least one of the facts was false and with reckless disregard of whether other facts contained in the [Commentary] were false." Smith's brief, at 31.
As for Smith's first assertion, the Commentary stated: "It's not clear if [Smith] was on duty at the time." Smith contends that Person "knew" that Smith was not on duty and knew, therefore, that the statement was false. We disagree.
As evidence of Person's knowledge, Smith cites only the affidavit of Wendell Johnson, a spokesperson for the Department. The affidavit stated:
 "Over a year ago, David Person, a columnist with the Huntsville Times contacted me about a story he was preparing to write. The story concerned Huntsville Police Investigator, Edward Smith, about allegations of race that occurred while he was off duty.
Allegations were made by a woman who lived next to one of Smith's rental properties. Although I had spoken with Investigator Smith, and ascertained his statement of the events, our departmental policies forbid us from talking about ongoing investigations, either criminal or by Internal Affairs.
 "I strongly advised David Person to wait until the investigations had been completed before writing a column. I told Mr. Person that I was aware of the allegations but had serious doubt as to the veracity of the woman's allegations. David Person asked me to contact Investigator Smith to get his side of the story. I told Mr. Person that Investigator Smith was an extremely private person and did not speak with the news media with relation to criminal cases, let alone an incident that occurred while he was off duty, where allegations of racial improprieties were made.
 "After my conversations with David Person, I felt that he should have had serious doubt as to the credibility of his source or sources. . . . David Person did his column against my advice, which was based on 21 years experience in journalism, law enforcement and public relations."
(Emphasis added.)
As we noted above, Smith routinely made arrests and otherwise exercised official *Page 501 
authority while he was off duty. Members of the public and press are not constrained by the technical distinctions he himself routinely ignored. Under these facts, nothing of consequence can be inferred from Smith's alleged off-duty status or from Person's characterization of it.
Smith argues that the Times published the Commentary "with reckless disregard of whether other facts contained in [it] were false." This is so, because, he insists, "Person had reason to doubt the veracity of Ms. Griffin. Wendell Johnson put him on notice that Ms. Griffin was not credible (Affidavit of Wendell Johnson)." Smith's brief, at 32 (emphasis in original).
Johnson allegedly impugned Griffin's veracity. However, the conversation between Person and Johnson occurred before the Department's investigation was concluded. Johnson's remarks were, therefore, nothing more than the naked aspersions of aspokesperson for the Department."To require that a reporter withhold such a story or face potential liability for defamation because a police officer denies a citizen's allegation of misconduct is exactly the type of self-censorship the New YorkTimes rule was intended to avoid." Roberts v. Dover,525 F.Supp. 987, 993 (M.D.Tenn. 1981). See Connaughton,491 U.S. at 691 n. 37, 109 S.Ct. 2678 ("Of course, the press need not accept `denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.'"); McNabb v. Oregonian Publ'g Co.,69 Or.App. 136, 142, 685 P.2d 458, 461-62 (1984) ("contradictory information that has come from the plaintiff public official or his supervisors provides little support for an inference of actual malice").
On October 27, 2000, when Person published his Commentary, he had little reason to doubt Griffin's account of events. Lavender had sent Person an e-mail, narrating the events essentially as contained in Griffin's complaint to the Department. The narrative concluded with the names of three individuals who had ostensibly witnessed the incident, including Robert Brooks. Before the Commentary was published, Person acquired a copy of the petition. Person personally spoke with Lavender, Deputy Chief Schenck, Brooks, and Johnson. He made two attempts to speak with Smith, but Johnson told him Smith would not comment on the matter. Schenck corroborated Griffin's account of her contact with the Department, and confirmed that she had filed a complaint. Additionally, Person testified that he related Griffin's story to a "confidential source," who, according to Person, stated that it "sounded like a plausible scenario." Based on the considerable information of which Person had availed himself, on October 27, 2000, he had no "obvious reason to doubt," McFarlane, 91 F.3d at 1513, Griffin's credibility. Similarly, there is no evidence of "purposeful avoidance" of the truth.
Finally, Smith contends that there is an issue of fact as to whether Robert Brooks, as the Commentary states, "was standing out on the porch at the time and confirms [Griffin's] account." Smith submitted the affidavit of Robert Brooks, which stated, in pertinent part:
 "[On October 5, 2000,] Helen Griffin came over and stated that Ed Smith called her a bitch, hooker, whore and a nigger. I replied: `[N]o he didn't, did he?' Helen then sat down in my home and started talking to the other people that were in my house.
 "Some time later, I was over at Helen's house and she told me I needed to talk to David Person, with the Huntsville Times. I got on the phone and the man stated that he was David Person *Page 502 
and that he was writing a story about Ed. Mr. Person asked me what happened between Helen Griffin and Ed in October. I told Mr. Person that `I don't know,' and he told me that Ms. Griffin stated to him that Ed Smith called her a whore, bitch, hooker and a nigger. I told Mr. Person that was the same story she told me. I told Mr. Person that I did not see or hear the things Helen said happened between her and Ed."
(Emphasis added.) This affidavit, Smith argues, proves that Person exaggerated Brooks's knowledge of the alleged incident. This exaggeration, Smith insists, somehow evidences actual malice.
The Times and Person moved to strike Brooks's affidavit, stating, in part:
 "The undisputed evidence is that Brooks is deceased. Mr. Brooks died prior to the case being filed by Smith and the defendants were not able to depose Mr. Brooks regarding this case. As such, this affidavit is hearsay and would not be admissible in the trial of the case. The plaintiff cannot rely on inadmissible evidence in an attempt to create an issue of fact."
The trial court granted the motion, and Smith contends the trial court erred in striking the affidavit. We need not determine whether the affidavit was inadmissible, because, assuming, for the sake of argument, that the trial court erred in striking it, the affidavit does not support Smith's argument.
The dispositive issue in this case is not whether Brooks told Person that he had overheard Smith's alleged verbal attack on Griffin. Instead, the issue is whether Smith has offered sufficient evidence indicating that Person either knew that Griffin's version of the alleged incident was false or that Person actually entertained a serious doubt as to the truth of her accusations. Person and the Times argue that the "[a]ffidavit in no way shows that Person knew or had serious doubts as to the truth of Griffin's account prior to publication." Appellees' brief, at 65. We agree. Indeed, Brooks's statement that he told Person that Griffin had told each of them "the same story" weighs heavily against a finding of actual malice, especially where Griffin's report to Brooks occurred soon after the alleged incident.
In short, Smith has not presented evidence of actual malice sufficient to defeat the summary-judgment motion. The trial court did not err, therefore, in entering a judgment for the Times and Person. Thus, the judgment is affirmed.
AFFIRMED.
HOUSTON, LYONS, JOHNSTONE, and HARWOOD, JJ., concur.
[1] Smith concedes, as he must, that the same standard applies to all of his claims, regardless of whether they are stated as "defamation" or "false light invasion of privacy." Smith's brief, at 44. See Hustler Magazine v. Falwell, 485 U.S. 46,108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (constitutional standard applies to claims of infliction of emotional distress); Time, Inc. v.Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) (constitutional standard applies to claims of invasion of right of privacy); Yohe v. Nugent, 321 F.3d 35 (1st Cir. 2003);Roberts v. Dover, 525 F.Supp. 987, 995 (M.D.Tenn. 1981).
[2] A transcript of this meeting was proffered by Smith in opposition to the summary-judgment motion.